UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| World Cam, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> Omnibond Systems, LLC and Kenneth Boyd Wilson, <br><br> Defendants, <br><br> AND <br><br> Omnibond Systems, LLC, <br><br> Counterclaim Plaintiff, <br><br> vs. <br><br> World Cam, LLC and Andrew Slattery, <br><br> Counterclaim Defendants. | Civil Action No. 8:19-2066-BHH <br><br> **OPINION AND ORDER** |

This matter is before the Court on Defendant/Counterclaim-Plaintiff Omnibond Systems, LLC's ("Omnibond") motion for preliminary injunction (ECF No. 10), and Plaintiff/Counterclaim-Defendant World Cam, LLC's ("World Cam") motion for preliminary injunction (ECF No. 25). For the reasons set forth herein, the Court grants Omnibond's motion and denies World Cam's motion.

## BACKGROUND

Omnibond is a software development company focusing on products that include computer-vision-based solutions for vehicle traffic monitoring. (Am. Countercl. ¶¶ 9–11, ECF No. 22.) World Cam is a small business formed by Counterclaim-Defendant Andrew Slattery ("Slattery") to operate a proprietary business process he developed for quick oil change facilities, which involves the use of cameras, equipment, cabling, software, and other technology to track, record, monitor, measure, schedule, improve, and expedite wait times, dwell times, service times, service performance, and other aspects of the quick oil change business. (Slattery Aff. ¶¶ 4–5, ECF No. 25-2.) As part of that business process, World Cam sought a video-analytics solution it could integrate with its camera and computer system for resale to quick oil change businesses, and Omnibond developed a new software product called "BayTracker" which met that need. (Am. Countercl. ¶¶ 15–24.)

After several years of research and development, World Cam presented its proprietary business process to Valvoline, LLC and Valvoline Instant Oil Change Franchising, Inc. (collectively "Valvoline"), and on April 25, 2017 entered into the Valvoline Agreement wherein it agreed to supply a turn-key, full-service version of its business process to Valvoline corporate stores and franchisee-owned stores (collectively "Valvoline stores"). (Slattery Aff. ¶¶ 6–8.) The Valvoline Agreement set forth an initial term of five (5) years in which World Cam would sell camera and computer equipment to Valvoline—with the BayTracker software preinstalled—and provide, at a rate of $55 per month per Valvoline store, various services to support and monitor the functionality of the BayTracker computers and software wherever they were installed. (*See* ECF No. 1-2 at

2–7.) The Valvoline Agreement explicitly references World Cam's independent agreement with Omnibond to provide the analytical services utilized by the BayTracker computers and software. (*See id.* at 2, 7.) While the Valvoline Agreement states that there is no obligation on the part of any franchisee store to elect to utilize the BayTracker software (*see id.* § 2.b.), it contemplates all Valvoline corporate stores and most, if not all, franchisee stores receiving installation of the BayTracker computers and software over time (*see id.* § 8.c. (stating, "*When ninety percent (90%) of the Franchisee Stores have purchased Equipment and Software hereunder*, VIOC[1] may, at its option, pay the Franchisee Store Monthly Services Fee on behalf of all VIOC Franchisees" (emphasis added))).

On May 22, 2017, Omnibond and World Cam entered into the Reseller Agreement, which appointed World Cam as an "independent nonexclusive reseller" of certain Omnibond products and services, including the BayTracker software, within World Cam's resale "territory"—expressly limited to Valvoline corporate and franchisee stores. (*See* ECF No. 1-1 § 1.1, Ex. A.) The Reseller Agreement provided that, during the term of the Valvoline Agreement, Omnibond would not market or sell, or authorize others to market or sell, the BayTracker software to an itemized list of other major quick oil change companies. (*Id.* § 1.1, Ex. B.) The Reseller Agreement further stated that Omnibond would share 50% of World Cam's monthly gross revenue from the sale of BayTracker, which World Cam would pay to Omnibond on a monthly basis. (*Id.* §§ 5.3, 5.4.) Unlike the 5-year term of the Valvoline Agreement, the Reseller Agreement provided for a 12-month term, to be automatically renewed for additional 12-month terms thereafter, with each

---

[1] The Valvoline Agreement refers to Valvoline Instant Oil Change, a business of Valvoline, LLC, and Valvoline Instant Oil Change Franchising, Inc., collectively as "VIOC." (ECF No. 1-2 at 2.)

party reserving the right to terminate the Reseller Agreement at any time, without cause, with 180 days' advance written notice. (*Id.* § 8.) On January 24, 2019, Omnibond exercised its right to terminate the Reseller Agreement by giving 180 days' notice of termination, resulting in an effective termination date of July 23, 2019. (Compl. ¶ 25, ECF No. 1.) Section 9.2(d) of the Reseller Agreement stated: "Notwithstanding the foregoing, upon termination, Omnibond will continue to honor existing agreements with end users for Omnibond's Products and Services, subject to Reseller's payment of all applicable fees, and the terms and conditions in Exhibits B and C, either directly or through another reseller of Omnibond's choosing." (ECF No. 1-1 § 9.2(d).)

World Cam filed this action against Omnibond and its CEO, Kenneth Boyd Wilson, on July 23, 2019, alleging claims for injunctive relief (Omnibond only), breach of contract (Omnibond only), tortious interference with contract, fraud, and violations of both South Carolina and North Carolina's unfair and deceptive trade practices statutes. (*See* ECF No. 1.) World Cam's claims center around Omnibond's refusal to bring new Valvoline stores "online" since the Reseller Agreement was terminated. (*See* ECF No. 25-1 at 5.) Once the necessary camera and computer equipment is installed at a Valvoline store, World Cam transmits an email request to Omnibond that the store go online, which simply involves Omnibond acknowledging the store's unique IP address so that the store's local BayTracker software can interact with the backend analytical services provided by Omnibond. (*See id.*; *see also* Ex. A, Omnibond Mot. for Prelim. Inj., ECF No. 10-3 (emails from World Cam to Omnibond seeking activation of various IP addresses).) By way of various theories of liability, World Cam essentially alleges that Omnibond has failed to fulfill its post-termination contractual duties to honor those portions of World Cam's

obligations to Valvoline for which Omnibond is ultimately responsible, and that Omnibond did so with the purpose of supplanting World Cam's profitable relationship with Valvoline. (*See* Compl. ¶¶ 24–42.)

Omnibond filed its motion for preliminary injunction on September 6, 2019, claiming that World Cam's authority to resell and distribute Omnibond's BayTracker software was immediately revoked upon termination of the Reseller Agreement, but that World Cam has continued to sell and install BayTracker software beyond the termination date, causing harm to Omnibond. (*See* ECF No. 10-1 at 2.) Omnibond's motion relates to its counterclaim for breach of contract against World Cam and requests that the Court enjoin World Cam from (1) reselling or installing BayTracker software, and (2) marketing, promoting, or advertising products containing BayTracker software. (*Id.* at 8, 16.) World Cam responded (ECF No. 24) and Omnibond replied (ECF No. 26) in turn.

World Cam filed its motion for preliminary injunction on October 7, 2019, claiming that Omnibond has breached section 9.2(d) of the Reseller Agreement and is actively attempting to dishonor and tortuously interfere with the Valvoline Agreement by sabotaging World Cam's ability to fulfill its obligations thereunder. (*See* ECF No. 25-1 at 2–3.) World Cam asserts that Omnibond's breach threatens World Cam with irreparable harm—specifically, the destruction of its business because Valvoline is its only customer. (*Id.* at 3.) World Cam requests that the Court enjoin Omnibond from its alleged breach of the Reseller Agreement and compel it to comply with its purported post-termination obligation to bring new stores online. (*See* ECF No. 25 at 1–2.) Omnibond responded (ECF No. 27) and World Cam replied (ECF No. 31) in turn.

These matters are ripe for consideration and the Court now issues the following

ruling.

## STANDARD OF REVIEW

The Supreme Court has stressed that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) ("Because preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power, this Court should be particularly exacting in its use of the abuse of discretion standard when it reviews an order granting a preliminary injunction." (quotation marks and citation omitted)). To obtain a preliminary injunction, the moving party must establish: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Id.* at 20. The party seeking the injunction bears the burden to establish each of these elements by a "clear showing." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated on other grounds*, 559 U.S. 1089 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010).

## DISCUSSION

Omnibond filed its motion for preliminary injunction first, and the Court will begin its discussion with that filing and the related briefing. It should be noted that Omnibond's request for a preliminary injunction relates to its counterclaim for breach of contract *only*. Omnibond argues that the instant dispute revolves around a straightforward legal question of contract interpretation: "Can World Cam continue to resell Omnibond's

6

BayTracker Software indefinitely as World Cam suggests, or does the explicit language of the Reseller Agreement terminate World Cam's distribution rights upon termination?" (ECF No. 10-1 at 2.) Omnibond asserts that the latter is true based on the plain language of the Reseller Agreement and contends that it is seeking to maintain the *status quo* post termination. (*Id.*) Moreover, Omnibond states that it "will continue to permit the then-existing (as of July 2019 date of termination) end users access to BayTracker and World Cam can continue to collect its share of revenue from those existing end users." (*Id.*) But it asserts that World Cam's conduct in continuing to resell BayTracker to new end users as if the Reseller Agreement was never terminated amounts to "pirat[ing] BayTracker." (*Id.*)

It is undisputed that Omnibond was within its rights to terminate the Reseller Agreement and that it did so pursuant to the contractually specified procedure, which resulted in an effective termination date of July 23, 2019. (*See* ECF No. 24 at 2.) However, World Cam argues that under section 9.2(d) the "existing agreement" that Omnibond promised to honor post termination is the Valvoline Agreement and the "end users" Omnibond promised to continue servicing are the "Stores" as defined in the Valvoline agreement, including *all* corporate and franchisee-owned stores. World Cam contends:

> From inception, the Valvoline Agreement and Reseller Agreement contemplated the inclusion of all Stores, even those added "after the Effective Date" of the Valvoline Agreement. There is no "new agreement with each Store as it is brought online with the Valvoline Complete Solution. Rather, the Store is brought online pursuant to, and in accordance with, the existing Valvoline Agreement and the Reseller Agreement.

(ECF No. 24 at 6 (citation omitted).)

While it appears to be true that the Valvoline Agreement, at signing, contemplated all corporate and franchisee-owned stores becoming participants in World Cam's

7

proprietary business process over time, it is also true that Omnibond is not a party to the Valvoline Agreement. This basic fact renders many of World Cam's arguments superfluous as they pertain to the merits of Omnibond's motion as well as World Cam's own motion for preliminary injunction.

The only relevant agreement between Omnibond and World Cam is the Reseller Agreement. World Cam and Omnibond agreed that either party could terminate that contract "at any time, without cause, with 180 days advance written notice." (ECF No. 1-1 § 8.) In the event of contract termination, World Cam's appointment as an "independent nonexclusive reseller to market and sell certain Omnibond Products and Services" under section 1.1 likewise terminated. (*See id.* § 9.2(e) (excluding § 1.1 from list of provisions that survive termination).) Under section 9.2(a), "Upon termination of this Agreement, Omnibond may terminate any or all unfilled orders." (*Id.* § 9.2(a).) Section 9.2(b) provided that World Cam would, upon termination, "immediately stop all marketing promotion, advertising or reference to Omnibond Products and Services." (*Id.* § 9.2(b).) Moreover, World Cam's limited right to distribute the BayTracker software terminated "automatically and immediately" upon the Reseller Agreement being terminated. (*See id.* § 7.2(c) ("Omnibond grants to Reseller *during the Term* a non-exclusive, non-transferable right to transfer to end users within the Territory the copies of the Programs it obtains under this Agreement only in object code form and as components of Omnibond Products and Services subject to the following terms & conditions: . . . . (c) Termination of this Agreement will *automatically and immediately* terminate Reseller's rights under this Section." (emphasis added)).) Despite the fact that World Cam acknowledges the Reseller Agreement was terminated on July 23, 2019, it has continued to resell and

distribute the BayTracker software to new stores/"end users" and to submit requests to Omnibond to bring those new end users online. (*See* Wilson Decl. ¶¶ 8–10, ECF No. 10-2; ECF No. 10-3 at 2–4.)

The first *Winter* factor is satisfied in this instance because Omnibond is likely to prevail on its breach of contract cause of action. Interpretation of a written contract is a question of law properly determined by the Court at the preliminary injunction stage. *See JAK Prods., Inc. v. Bayer*, 616 F. App'x 94, 95 (4th Cir. 2015) (holding district court did not abuse its discretion in denying preliminary injunction motion after determining that employment contract was facially unreasonable under state law and thus not enforceable). South Carolina law governs the interpretation of the Reseller Agreement. (*See* ECF No. § 15.2.) Under South Carolina law, "[t]he elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach." *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. Ct. App. 2009) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (1962)). "'Contract interpretation begins with the plain language of the agreement.'" *Stevens Aviation, Inc. v. DynCorp Int'l LLC*, 756 S.E.2d 148, 152 (2014) (quoting *Gould Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Ashley River Properties I, LLC v. Ashley River Properties II, LLC*, 648 S.E.2d 295, 299 (S.C. Ct. App. 2007) (citation omitted). "If the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Id.* Moreover, "When a contract is unambiguous, a court must construe its provisions according to the terms the parties used as understood in their plain, ordinary, and popular sense." *Id.* (citing *C.A.N.*

9

*Enter., Inc. v. S.C. Health Human Servs. Fin. Comm'n*, 373 S.E.2d 584, 586 (1988)).

Here, the parties agree on the existence of a valid contract and the terms in question are unambiguous. While the parties also agree that the Reseller Agreement was breached, they disagree as to who breached it and who is suffering damages. The Court finds that Omnibond has made a clear showing that it is likely to prevail on its breach of contract cause of action because there is no plausible interpretation of the Reseller Agreement under which World Cam could justify continued resale and distribution of the BayTracker software after the agreement was validly terminated. (*See* ECF No. 1-1 §§ 7.2(c), 9.2(b).) The "breach" element is met because World Cam has indeed continued to resell and distribute the BayTracker software, and the "damages" element is met by misappropriation of Omnibond's intellectual property, loss of revenue, and loss of market share. So much is clear.

Perhaps because these points are relatively obvious, World Cam has pivoted to the idea that it no longer engages in "selling," "installing," or "marketing, promoting, or advertising" the BayTracker software. (ECF No. 24 at 9–11.) World Cam argues that it only ever "sold" its proprietary business process to Valvoline at the time the Valvoline Agreement was executed, but since that date Valvoline itself has been "selling" World Cam's business process—including BayTracker—to the network of Valvoline franchisee-owned stores, has been coordinating installation of the technology at corporate and franchisee stores, and has been communicating directly with those stores regarding the addition of the technology. (*Id.*) In sum, World Cam contends that, to the extent any entity is selling, installing, marketing, promoting, or advertising the BayTracker software, "it is Valvoline who is engaged in the conduct Omnibond now seeks to enjoin." (*Id.* at 11.)

This line of argument is too clever by half. Relevant portions of the Valvoline Agreement make it abundantly clear that: (1) the relationship between Valvoline and World Cam, respectively, was one of buyer and seller, recipient of products and distributor, recipient of services and service provider; and (2) the relationship was ongoing, *i.e.* the buying and selling aspect was not consummated when the Valvoline Agreement was signed:

> 2. Equipment
>
> a. *Description of Equipment*. World Cam **will sell** the camera and computer equipment of the type described . . . to VIOC pursuant to the terms of this Agreement.
>
> b. *No Minimum Quantities of Equipment Purchased*. VIOC will provide World Cam with a forecast on the first day of each calendar quarter that will detail (i) the amount of Equipment that VIOC and the VIOC Franchisees **expect to purchase** in the upcoming quarter . . . (the "Quarterly Forecast"). . . . Notwithstanding the Quarterly Forecast, VIOC shall not be under any obligation to purchase any minimum quantity of Equipment from World Cam; provided, however, that, if VIOC elects to utilize the Software in the Corporate Stores during the Term, VIOC **shall**, subject to World Cam's ability to supply such Equipment, **purchase all of its requirements for the Equipment** listed under the headings "BayTracker Core Equipment List" and "Optional BayTracker Core Plus Equipment List" . . . **exclusively from World Cam for use with the Software in such Stores**. . . . [I]f a given VIOC Franchisee elects to utilize the Software in its Franchisee Store(s) during the Term, such Franchisee **shall** . . . **purchase all of its requirements for the Equipment** . . . **exclusively from World Cam for use with the Software in such Stores**. . . .
>
> . . . .
>
> d. *Ordering of Equipment*. VIOC **will submit purchase orders** for the Equipment to World Cam on a periodic basis. . . .
>
> e. *Delivery of Equipment/Risk of Loss*. World Cam **shall be responsible for arranging and insuring the timely delivery** of the Equipment t VIOC at the address specified in each Corporate Equipment Order (the "Ship-to-Point"). . . .
>
> . . . .

11

> 3. BayTracker Software
>
> a. *Description of the BayTracker Software*. The BayTracker software . . . **will be pre-installed by World Cam on each BayTracker Computer**. . . .
>
> . . . .
>
> 4. Provision of Services by World Cam
>
> a. *Content of Services.* During the Term, World Cam **will provide the following services** on a monthly basis to VIOC with respect to the Corporate Stores and to the VIOC Franchisees with respect to the Franchisee Stores: (i) **right to use the Software** . . . . **Performance of the Service** with respect to a given Corporate Store or Franchisee Store **will begin on the installation of the Equipment in such Store**. . . .
>
> . . . .
>
> c. *Fee for Services*. World Cam **will provide Services** to VIOC at a rate of $55 per month per Corporate Store . . . and to the VIOC Franchisees at a rate of $55 per month per Franchisee Store . . . In the event that the **Services begin as to a given Corporate Store or Franchisee Store** on any day of a month that is not the first day of that month, the relevant Services Fee shall be prorated for such partial month. . . .

(ECF No. 1-2 at 3–4 (emphasis added).) These provisions indicate the future tense of World Cam's contractual selling, delivering, and servicing the BayTracker software. However, even if one were to accept World Cam's argument that it is no longer "selling" Omnibond's software, but merely fulfilling the lingering requirements of a previously consummated "sale," World Cam's theory does not hold water. There is simply no way to get around the fact that World Cam's right to distribute copies of the BayTracker software terminated "automatically and immediately" upon the Reseller Agreement being terminated. (*See* ECF No. 1-1 §§ 7.2(c), 9.2(e) (reflecting that the contractual provision authorizing World Cam's distribution of the software did not survive termination)).) Yet, World Cam has continued to distribute preinstalled iterations of the BayTracker software

12

on computer equipment delivered to new Valvoline stores, with no apparent intention to stop doing so. (*See* Wilson Decl. ¶¶ 8–10.)

World Cam's reading of section 9.2(d) of the Reseller Agreement—which would allow World Cam to distribute the BayTracker software to new end users after the termination of the Reseller Agreement—would theoretically require Omnibond to begin servicing new Valvoline end users under World Cam's "existing agreement" with Valvoline in perpetuity. But this reading of section 9.2(d) would render other portions of the Reseller Agreement meaningless, such as: (1) section 9.2(a)—which allows Omnibond, upon termination of the agreement, to "terminate any or all unfilled orders"—by requiring Omnibond to fulfill all Valvoline orders for the duration of World Cam's relationship with Valvoline; and (2) section 8—which gives Omnibond the right to terminate the agreement—by requiring Omnibond to continue to permit World Cam to sell and distribute Omnibond products and services to the entire "Territory" (as defined in section 1.1 of the Reseller Agreement) for the life of the Valvoline Agreement, the duration of which Omnibond has no control over because it is not a contracting party. To endorse such a reading of section 9.2(d) would be to contravene a fundamental tenet of contract interpretation: "[A]n interpretation that gives meaning to all parts of the contract is preferable to one which renders provisions in the contract meaningless or superfluous." *Stevens Aviation, Inc. v. DynCorp Int'l LLC*, 756 S.E.2d 148, 153 (2014) (quotation marks and citation omitted). Ultimately, the Court agrees with Omnibond that, "Read in light of the contract as a whole, the terms 'existing agreements' and 'end users' clearly refer to Valvoline Corporate Stores and Franchises that had submitted purchase orders via World Cam and received Omnibond products and services prior to the termination of the

13

Reseller Agreement." (ECF No. 10-1 at 10.) Accordingly, the first *Winter* factor has been satisfied.

With respect to the second *Winter* factor, Omnibond asserts that World Cam's misuse of its proprietary software threatens to irreparably harm Omnibond in three ways. First, Omnibond contends that "World Cam's actions create confusion in the marketplace that has and will continue to damage Omnibond's reputation and goodwill with its customers." (ECF No. 10-1 at 13.) This portion of Omnibond's argument is unpersuasive and requires little discussion. Omnibond has not made an adequate showing that World Cam's post-termination distribution of preinstalled BayTracker software to new Valvoline end users will sow confusion in the marketplace or cause imminent damage to Omnibond's reputation and goodwill.

Second, Omnibond asserts that "World Cam's continued sale of the BayTracker Software to new users inherently undercuts Omnibond's direct sales market share," and "[a]bsent preliminary relief, World Cam . . . will continue to infringe on [Omnibond's direct sales] right and diminish Omnibond's market share by directly competing with Omnibond for the sale of Omnibond's proprietary software." (*Id.*) This argument has merit. "[I]rreparable harm can be established by the loss of market share or price erosion, neither of which can be compensated through money damages alone." *Pearl Ins. Grp., LLC v. Baker*, No. 0:18-CV-02353-JMC, 2018 WL 4103333, at *5 (D.S.C. Aug. 29, 2018) (citing *Z–Man Fishing Prods., Inc. v. Renosky*, 790 F. Supp. 2d 418, 4333 (D.S.C. 2011)). In the absence of preliminary relief, World Cam appears intent on distributing the BayTracker software to new Valvoline end users, the same stores to which Omnibond would hope to sell its software directly. Given the inherent uncertainty about the duration of this litigation,

14

if the Court did not grant preliminary relief and Omnibond ultimately prevailed on its breach of contract cause of action, an ex-post analysis of damages could not accurately measure the loss of market share and pricing differential that Omnibond would suffer if World Cam continues to encroach on Omnibond's direct sales market.

Third, Omnibond argues that World Cam's "multiple breaches" of the Reseller Agreement and "secret misappropriation" of Omnibond's proprietary information weigh in favor of the Court granting injunctive relief. (*See* ECF No. 10-1 at 14.) Here, Omnibond states that World Cam has breached the Reseller Agreement by: "(1) failing to pay Omnibond its share of the sales revenue, (2) seeking to obtain a patent on Omnibond's proprietary software, (3) failing to comply with the Reseller Agreement's § 15.6 Dispute Resolution provision, and (4) publicly disclosing Omnibond's confidential information."[2] (*Id.* (citing Countercl. ¶¶ 58–71, ECF No. 22; Wilson Decl. ¶¶ 6–13).) While some or all of these allegations may prove to be true upon proper evidentiary support, with the exception of the uncontested fact that World Cam filed a patent application including disclosures about the functioning of Omnibond's BayTracker software, it is difficult to see precisely how Omnibond presumes to show *irreparable* injury by them. Nonetheless, "loss

---

[2] Curiously, World Cam declined, in all its briefing on the preliminary injunction issue, to respond to or even acknowledge Omnibond's allegation that World Cam misappropriated Omnibond's intellectual property by including detailed information describing the operation, features, and implementation of the BayTracker software in its patent filings. (*See* ECF Nos. 24, 26, 31.) That Omnibond retained *all* intellectual property rights to the BayTracker software in the Reseller Agreement could not be clearer: "As between Omnibond and Reseller, all right, title and interest in and to Omnibond's Products and Services, and any related materials and/or documentation, including without limitation all copyrights, patent rights, trademark and service mark rights, trade secret rights and other intellectual property rights are and will remain the sole property of Omnibond, and such items may only be used by Reseller as expressly permitted herein." (ECF No. 1-1 § 6(b).) Thus far, it is unclear how World Cam would seek to justify including any of Omnibond's proprietary information in its patent filings.

of proprietary information may constitute irreparable harm." *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 711 (M.D.N.C. 2009) (citing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994)). Detailed information about the operation, features, and implementation of Omnibond's proprietary software is surely the kind of information it seeks to protect in order to preserve its ability to compete with other software developers, and Omnibond's assertion that World Cam wrongfully disclosed its confidential trade secrets by publishing them in a patent application has gone unanswered.

The Court finds that Omnibond has—both with respect to unauthorized disclosure of its intellectual property, and with respect to a loss of market share and accompanying revenue—made a clear showing that that it will suffer irreparable harm in the absence of injunctive relief. Accordingly, the second *Winter* factor is satisfied.

The Court further finds that the balance of equities favors the grant of a preliminary injunction in Omnibond's favor because the damage that would result if World Cam continues to resell and distribute Omnibond's products and services to new end users outweighs any undue harm to World Cam from enforcement of the Reseller Agreement. Omnibond argues that its "reputation, future sales, and ownership over its proprietary software are all threatened by World Cam's conduct," whereas, "[t]o the extent that World Cam would be injured at all by a preliminary injunction, this harm only mirrors the position that World Cam would occupy if it were to abide by the terms of the Reseller Agreement— a contract that World Cam ratified." (ECF No. 10-1 at 14–15.) The Court agrees. Where the harm suffered by a non-movant is a consequence of that party's failure to abide by a valid contract, the balance of equities tips in the movant's favor. *See, e.g., Carlson Envtl.*

*Consultants, PC v. Slayton*, No. 3:17-cv-149-FDW-DCK, 2017 WL 4225993, at *11 (W.D.N.C. Sept. 21, 2017) (finding the balance of equities was in the non-movant's favor where the damage that would result as a direct consequence of his continued violation of a noncompetition agreement outweighed any harm to him from enforcing that agreement) (citation omitted). Moreover, Omnibond points out in convincing fashion that since World Cam's contends it is entitled to fifty percent of the monthly revenue from servicing the BayTracker software, the amount that Omnibond would owe World Cam could be easily quantified if, for the sake of argument, World Cam prevails on the merits of the dueling breach of contract claims at trial. (*See* ECF No. 10-1 at 15.)

World Cam argues that the balance of equities cannot favor Omnibond because Omnibond's "refus[al] to add and service Stores pursuant to the Valvoline Agreement and the Reseller Agreement" is "nothing more than a thinly-veiled attempt to interfere with the contractual relationship between World Cam and Valvoline, strip World Cam of the rights and financial benefits derived from the Valvoline Agreement, and enter a direct relationship with Valvoline." (ECF No. 24 at 14.) The Court does not know, and will not speculate as to, why World Cam entered into a contract with Valvoline that presumed a non-contracting party's involvement for five years, but then separately agreed to a twelve-month term with that non-contracting party (Omnibond) which could be cancelled without cause at any time, given appropriate notice. (*See* ECF No. 1-1 § 8.) Moreover, the Valvoline Agreement does not include any noncompete clause pertaining to Omnibond, which is, ultimately, the true the owner of the BayTracker code and operator of the related data analytics. (*See generally* ECF No. 1-2 (including no noncompete clause).) In other words, to the extent World Cam is unable to fulfill its contractual duties to Valvoline without

Omnibond's cooperation, World Cam seems to have put itself in a bind of its own making by either—(1) failing to ensure that the term of the Reseller Agreement matched the term of the Valvoline Agreement, or (2) allowing its relationship with Omnibond to deteriorate such that Omnibond sought to terminate the Reseller Agreement before the Valvoline Agreement had run its course—or both. The Court has little trouble in concluding that the balance of equities tips in Omnibond's favor and the third *Winter* factor is satisfied.

Finally, the Court finds that the public interest would be served by granting Omnibond's motion for a preliminary injunction. A company has a "legitimate interest in developing its customer relationships . . . without fear [its confidential and proprietary information] will end up in the hands of a competitor." *Philips Elecs.*, 631 F. Supp. 2d at 724 (citing *Travenol Labs., Inc. v. Turner*, 228 S.E.2d 478, 483 (1976)). As set forth above, if World Cam is permitted to continue reselling and distributing BayTracker as if the Reseller Agreement was not terminated, World Cam will continue to place itself in direct competition with Omnibond for the sale of its proprietary software product. "The public interest is also served by 'ensuring that contracts are enforced' and preventing 'unethical business behavior.'" *Id.* (quoting *UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 448 (W.D.N.C.2002)); *see also XPO Logistics, Inc. v. Northrop*, No. 3:19-cv-348-FDW-DSC, 2019 WL 3543877, at *9 (W.D.N.C. Aug. 2, 2019) ("It is in the public interest for courts to enforce agreements, such as the Agreement here, that private parties enter into knowingly and voluntarily."); *Pearl Ins. Grp.*, 2018 WL 4103333, at *5 (holding that preliminary injunctive relief is appropriate when it "is consistent with the public interests of enforcing valid contracts, preventing unfair competition, and protecting confidential, trade-secret information from improper misappropriation"). In the instant case, where the

parties agree that the Reseller Agreement is a valid contract, and agree that Omnibond successfully terminated the agreement for convenience, the public interest is served by the Court enforcing the post-termination status quo—namely, that World Cam no longer possesses any right to resell, distribute, market, promote, or advertise the BayTracker software. Accordingly, the fourth *Winter* factor is satisfied and Omnibond's motion for a preliminary injunction is granted.

World Cam's motion for a preliminary injunction asserts an interpretation of section 9.2(d) of the Reseller Agreement that the Court has already considered and rejected. (*See* ECF No. 25); *supra* at 13–14. Therefore, the *Winter* factors are *not* satisfied with respect to World Cam's motion for the same reasons those factors *are* satisfied with respect to Omnibond's motion, and the Court need not repeat its analysis here. Accordingly, World Cam's motion for a preliminary injunction is denied.

## CONCLUSION

For the reasons set forth above, Omnibond's motion for a preliminary injunction (ECF No. 10) is GRANTED, and World Cam's motion for a preliminary injunction (ECF No. 25) is DENIED. World Cam is hereby enjoined from (1) reselling or installing BayTracker software, and (2) marketing, promoting, or advertising products containing BayTracker software.

**IT IS SO ORDERED.**

                                        /s/ Bruce Howe Hendricks
                                        United States District Judge

November 20, 2019
Greenville, South Carolina